1
2
3
4
5
6
7

8                          UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CETERA ADVISOR NETWORKS LLC,              No.  2:19-cv-00299-DAD-JDP

12              Plaintiff,

13        v.                                    ORDER GRANTING IN PART AND
                                                DENYING IN PART CROSS-CLAIMANT
14   PROTECTIVE PROPERTY AND                    PROTECTIVE PROPERTY AND
     CASUALTY INSURANCE COMPANY,                CASUALTY INSURANCE COMPANY'S
15   et al.,                                    CROSS-MOTION FOR SUMMARY
                                                JUDGMENT IN ITS FAVOR AND
16              Defendants.                      GRANTING CROSS-DEFENDANT
                                                PORTFOLIO'S CROSS-MOTION FOR
17                                              SUMMARY JUDGMENT IN ITS FAVOR

18                                              (Doc. Nos. 136, 138)

19   PROTECTIVE PROPERTY AND
     CASUALTY INSURANCE COMPANY,
20
                Cross-Claimant,
21
          v.
22
     GERALD B. GLAZER, et al.,
23
                Cross-Defendants.
24

25   AND RELATED COUNTERCLAIMS
     AND CROSS-CLAIMS
26

27

28   /////

                                         1

This matter is before the court on the motion filed on November 3, 2023 by cross-defendant Portfolio General Management Group, Inc. ("Portfolio")[1] seeking summary judgment in its favor and against cross-claimant Cal Capital Limited ("Cal Capital").  (Doc. No. 136.)  Also before the court is the cross-motion filed on November 17, 2023 by cross-claimant Protective Property and Casualty Insurance Company ("Protective") seeking for summary judgment in its favor and against Cal Capital.  (Doc. No. 138.)  The pending motions were taken under submission on the papers on December 4, 2023.  (Doc. No. 142.)  For the reasons explained below, Portfolio's motion for summary judgment will be granted in its entirety, and Protective's motion for summary judgment will be granted in part and denied in part.

## BACKGROUND

### Factual Background[2]

Portfolio is an entity that sells vehicle ownership protection products, such as vehicle service contracts ("VSCs").[3]  (PUF ¶ 1.)  Portfolio markets VSCs to car dealerships that in turn

/////

---

[1]  The docket reflects the name of this party as Portfolio, with no further identification of this entity's form, and the caption of Cal Capital's cross-claim also does not provide any such information.  (*See* Doc. No. 16 at 1.)  In its cross-claim, Cal Capital alleges that "Portfolio is a corporation with an unknown origin but maintains its principal place of business in Los Angeles, California."  (*Id.* at 5.)  In its answer to Cal Capital's cross-claim, cross-defendant Portfolio noted that "Portfolio is incorrectly named in this cross-claim as Portfolio.  The proper entity . . . is Portfolio General Management Group, Inc."  (Doc. No. 28 at 2 n.1.)  Accordingly, the court will direct the Clerk of the Court to update the docket to identify this cross-defendant as Portfolio General Management Group, Inc.

[2]  The facts that follow are undisputed unless otherwise noted and are derived from the undisputed facts as stated by Portfolio, responded to by Cal Capital, and replied to by Portfolio (Doc. No. 140-1) ("PUF"); the undisputed facts as stated by Protective, responded to by Cal Capital, and replied to by Protective (Doc. No. 143-1) ("RUF"); and the exhibits attached to the affidavits filed by the parties in support of their respective briefs (Doc. Nos. 136-2, 136-3, 138-2, 138-3, 138-4, 139-2, 139-3, 139-4, 139-5, 139-6, 141-2, 141-3, 141-4, 141-5, 141-6).  In addition, Protective incorporates by reference Portfolio's statement of undisputed facts into its own.  (*See* Doc. No. 138 at 6.)  The court will not separately cite Protective's undisputed facts where they overlap with Portfolio's.

[3]  While Protective does not list this definition as an undisputed fact, Protective states in its pending motion that a "VSC is a contract that covers the cost of certain repairs that may be outside the scope of the automobile manufacturer's warranty."  (Doc. No. 138 at 7 n.1.)

1   sell the VSCs to their customers.[4]  (PUF ¶ 2.)  Portfolio is a privately-held California corporation

2   with its primary offices in Lake Forest, California; Strongsville, Ohio; and Dallas, Texas.  (PUF

3   ¶ 17.)  Portfolio's largest investor is the private equity firm ARBY Partners, and its parent

4   company, Turbo Holdco, LLC, is a Delaware limited liability company.  (PUF ¶¶ 15, 16.)

5          Protective is a publicly-held insurance company that operates in various states, with

6   principal locations in Alabama, Ohio, and Missouri.  (PUF ¶ 18.)  Protective's parent company is

7   Protective Life Incorporated, a Delaware corporation with its principal offices in Alabama, Ohio,

8   and Missouri.  (PUF ¶ 12.)  That parent company was purchased in 2014 by the Dai-ichi Life

9   Insurance Company.  (PUF ¶ 13.)  Portfolio and Protective have different Boards of Directors and

10  corporate officers.  (PUF ¶ 10.)

11         Cal Capital was formed in 2008 with Gerald Glazer and Haskall McCraw as its principals.

12  (PUF ¶¶ 33, 35, 45; RUF ¶ 5.)  From 2008 through 2017, Glazer and McCraw owned an Infiniti

13  car dealership in Sacramento, California ("Sacramento Infiniti").  (PUF ¶¶ 34, 50; RUF ¶ 3.)

14  During that time, Sacramento Infiniti sold VSCs to its customers pursuant to a contract ("the

15  Dealership Agreement") with Portfolio and Protective.[5]  (PUF ¶¶ 33, 34.)  The VSCs were

16  /////

17  /////

18  /////

19  /////

20  /////

21  /////

22  /////

23

24  [4]  Cal Capital purports to dispute this fact but the evidence to which it cites does not support its
    contention.  (PUF ¶ 2.)

25  [5]  Cal Capital offers as an undisputed fact that the VSCs were sold by Cal Capital, not Sacramento
26  Infiniti (PUF ¶¶ 1, 2), but then later repeatedly refers to "VSCs sold by the Dealership" in its
    response to Portfolio's statement of undisputed facts (*see, e.g.*, PUF ¶¶ 25, 31, 32; *see also id.* at
27  ¶ 34 ("The Dealership sold multiple different Portfolio products, not just the Elite Program
    [VSCs].")).  In any event, this purported dispute is immaterial because ultimately, the analysis
28  and rulings on the pending motions do not turn on which entity sold the VSCs.

insured and underwritten by Protective and its affiliates.[6]  (Doc. No. 141-2 at 9–12.)  Protective[7] then received reinsurance for the VSCs from Chesterfield International Reinsurance Limited ("Chesterfield"), an affiliate of Protective.  (Doc. Nos. 138-2 at 239–46; 141-2 at 4–7.)

On November 10, 2009, Chesterfield and Cal Capital signed an agreement ("the Assignment Agreement") obligating Cal Capital to reimburse Chesterfield for certain amounts that Chesterfield was required to pay Protective as reinsurer of the VSCs.  (RUF ¶¶ 6–7.)  In return for reimbursing Chesterfield, Cal Capital was entitled to retain VSC revenues net of certain costs.  (RUF ¶ 8.)  The Assignment Agreement also provided for the establishment of a trust account into which some portion of the VSC premiums would be deposited.  (PUF ¶¶ 37, 44.)

On or about November 10, 2009, Cal Capital executed an agreement instructing Protective to establish the trust account contemplated in the Assignment Agreement ("the Trust Agreement").[8]  (RUF ¶ 11.)  Pursuant to the Trust Agreement, a trust account was established with a financial institution, former plaintiff-in-interpleader Cetera Advisor Networks LLC ("the Trust Account").  (PUF ¶¶ 44, 47.)  Protective was appointed trustee of the Trust Account under

/////

/////

/////

/////

---

[6]  Cal Capital contends that the VSCs were also insured and underwritten by Portfolio, but Cal Capital's only evidence cited in support of this contention is an agreement post-dating all the VSCs at issue in this action—and which in any event would not support Cal Capital's contention even if it pre-dated the VSCs—and a conclusory declaration that itself relies on an agreement to which Portfolio was not a party.  (RUF ¶ 2.)  Thus, the evidence upon which Cal Capital relies does not support its contention in this regard.

[7]  Protective was formerly known as "Lyndon Property Insurance" and appears under that name on several agreements at issue in this action.  (RUF ¶ 12.)  The court refers to Protective by its current name for the sake of simplicity.

[8]  Multiple agreements were signed in successive years regarding the trust account contemplated in the Assignment Agreement.  These agreements are identical in all relevant respects for the purposes of the pending motions for summary judgment, so the court will refer to them collectively as "the Trust Agreement."

the Trust Agreement.  (PUF ¶ 48[9]; *see also* RUF ¶ 13[10].)  Under both the Assignment Agreement and the Trust Agreement, Chesterfield had a right to reimbursement from the Trust Account for the VSC claims that Protective was obligated to pay, and Protective had the right to withdraw these reimbursement amounts.[11][12]  (RUF ¶ 9; PUF ¶ 49; Doc. No. 141-2 at 4.)

Glazer and McCraw sold Sacramento Infiniti and stopped selling VSCs in or around June 2017.  (PUF ¶ 50.)  From 2008 until that sale, VSC claims were properly adjudicated and paid.[13]  (RUF ¶¶ 14, 16.)  Protective was timely reimbursed for the claims during that period.  (RUF ¶ 16.)  After the sale, Cal Capital stopped receiving new premiums from VSC sales to replenish

---

[9]  Cal Capital purports to dispute this fact in its response to Portfolio's statement of undisputed facts but its argument is non-responsive to Portfolio's proposed undisputed fact.  (*See* PUF ¶ 48.)

[10]  While Cal Capital's argument is unclear in this regard, in its response to Protective's statement of undisputed facts it appears to dispute this fact on the grounds that it "fired" Protective in 2017.  (*See* RUF ¶ 13.)  Cal Capital does not explain how it "fired" Protective, what authority it had to remove Protective, or whether Protective was actually terminated as trustee.  In any event, the evidence cited by Cal Capital in support of its difficult to decipher argument does not support a finding that Protective was ever removed as trustee.

[11]  Cal Capital disputes the conditions under which Protective was permitted to withdraw reimbursement amounts from the trust account.  (RUF ¶ 9.)  The contours and materiality of this dispute are addressed in the court's analysis below.

[12]  Protective offers as an undisputed fact that Chesterfield assigned its rights to reimbursement to Protective in October 2020.  (RUF ¶ 10.)  In support of this contention, Protective cites to a purported copy of the agreement wherein Chesterfield assigned its rights to Protective ("the Chesterfield Agreement").  (RUF ¶ 10.)  Cal Capital objects to that evidence on the grounds that the Chesterfield Agreement, which is attached as an exhibit to a deposition submitted by Protective in support of its pending motion, lacks authentication.  (Doc. No. 141-3 at 18–19.)  Indeed, nothing in the deposition testimony to which the Chesterfield Agreement is attached authenticates the contents of that Agreement.  However, regardless of whether Chesterfield assigned the ultimate rights to reimbursement to Protective, it is undisputed that Protective was permitted to withdraw reimbursement amounts from the Trust Account under the Assignment and Trust Agreements.  Whether Protective was permitted to retain those amounts or was instead required to pay them in turn to Chesterfield is immaterial to the resolution of the pending motions and the court need not rely on that agreement.  Cal Capital's objection in this regard will therefore be overruled as moot.

[13]  Cal Capital purports to dispute its role in the VSC claims adjudication process—an issue the court addresses in its analysis below—but Cal Capital does not cite to any evidence supporting an assertion that the claims adjudication process or results were improper prior to 2017.  (*See* RUF ¶¶ 14, 16.)

1  the funds in the Trust Account.  (PUF ¶ 51.)  However, Cal Capital still remained obligated to

2  reimburse Protective from the Trust Account for claims brought under previously-sold VSCs.[14]

3  (PUF ¶ 51.)  According to Cal Capital, immediately after the sale, Protective and Portfolio began

4  overpaying and inappropriately administering claims brought under the VSCs.[15]  (PUF ¶ 52.)

5          Glazer objected to the rise in claim payments and in August 2017 instructed Cetera not to

6  allow further withdrawals by Protective from the Trust Account.  (PUF ¶¶ 52–57.)  In the

7  following months, Glazer demanded supporting documentation from Protective for the VSC

8  claims it had paid.  (RUF ¶ 21.)  Protective duly provided the complete claim files for all VSCs

9  during the time period in question.  (RUF ¶ 22.)

10         Cetera did not thereafter release any funds to Protective and instead filed this interpleader

11  action on February 15, 2019, naming Protective, Cal Capital, and Glazer as defendants-in-

12  interpleader.  (PUF ¶ 57; *see also* Doc. No. 1.)  According to Protective, as of the filing of its

13  pending motion on November 17, 2023, Protective was owed $536,758.82 by Cal Capital.  (RUF

14  ¶ 31.)

15  **A.     Procedural Background**

16         On August 10, 2020, the previously-assigned district judge granted Cetera leave to

17  liquidate the assets in the Trust Account and to deposit the interpleader proceeds in the court's

18  registry account.  (Doc. No. 78.)  On September 9, 2020, Cetera deposited $473,643.62 with the

19  court and was subsequently terminated as a party from this action.  (Doc. No. 79.)

20         Cal Capital filed its cross-claim against Protective and Portfolio on April 19, 2019,

21  asserting nine claims:  (1) breach of fiduciary duty against Protective; (2) breach of contract

22  against Protective; (3) breach of the covenant of good faith and fair dealing against Protective;

23  (4) violation of the California Unfair Competition Law, California Business and Professions Code

24  §§ 17200, *et seq.* ("UCL") against Protective; (5) breach of fiduciary duty against Portfolio;

25  ─────────────────────
    [14]  Cal Capital disputes whether it was obligated to reimburse Protective for all such claims or

26  solely for "valid" claims.  (PUF ¶ 51.)  The court addresses this issue in its analysis below.

27  [15]  Protective disputes the alleged impropriety of the claims adjudication process.  (RUF ¶ 20.)
    Portfolio disputes having any role at all in the adjudication of VSC claims.  (*See, e.g.*, PUF ¶ 9.)

28  The court will address these issues in its analysis below.

6

(6) breach of contract against Portfolio; (7) breach of the covenant of good faith and fair dealing against Portfolio; (8) violation of the UCL against Portfolio; and (9) seeking declaratory relief against Protective.  (Doc. No. 16.)

Cal Capital filed a motion to dismiss Protective's claims brought against it on December 11, 2020.  (Doc. No. 90.)  That motion was denied by the previously-assigned district judge on April 12, 2021.  (Doc. No. 100.)

Protective filed its operative first amended cross-claim ("FACC") against Cal Capital on October 19, 2020, asserting a breach of contract claim and a claim for declaratory relief.  (Doc. No. 89.)

On August 14, 2023, this case was reassigned to the undersigned.  (Doc. No. 129.)

On November 3, 2023, Portfolio filed its pending motion for summary judgment in its favor on all of Cal Capital's claims brought against it.  (Doc. No. 136.)  Cal Capital filed its opposition to Portfolio's motion on November 17, 2023.  (Doc. No. 139.)  Portfolio filed its reply thereto on November 27, 2023.  (Doc. No. 140).

On November 17, 2023, Protective filed its pending motion for summary judgment in its favor on all of Cal Capital's claims brought against it and on its own cross-claim for breach of contract brought against Cal Capital in its FACC.  (Doc. No. 138.)  Cal Capital filed its opposition to Protective's motion on December 1, 2023.  (Doc. No. 140.)  Protective filed its reply thereto on December 11, 2023.  (Doc. No. 143.)

In connection with its oppositions to the pending motions, Cal Capital filed objections to certain evidence submitted by Portfolio and Protective in support of their pending motions.  (Doc. Nos. 139-61, 141-3.)  All of Cal Capital's objections will be overruled.  To the extent Cal Capital objects to documents that it also presented as evidence in support of its oppositions to the pending motions—such as the Trust Agreement—those objections are overruled.  *See Bernstein v. Kemper Indep. Ins. Co.*, 670 F. Supp. 3d 1018, 1030 (E.D. Cal. 2023).  Cal Capital objects to the purported copies of the Assignment Agreement provided by Protective and Portfolio in support of their pending motions on the grounds that the documents lack authentication.  (*See* Doc. No. 141-3 at 6.)  The court notes that both Protective and Portfolio

1    provided the Assignment Agreement as an attachment to the deposition testimony of Scott

2    Karchunas, but Karchunas did not authenticate the Agreement in his testimony submitted to the

3    court on summary judgment.  (*See* Doc. Nos. 136-3; 138-2.)  Additionally, Portfolio did not

4    provide the court reporter's certification authenticating Karchunas's deposition testimony.  (*See*

5    Doc. No. 136-3.)  Nonetheless, Cal Capital does not dispute that it entered into the Assignment

6    Agreement.  (*See, e.g.*, RUF ¶ 6.)  In fact, Cal Capital repeatedly cites to, quotes provisions from,

7    and relies on a purported copy of the Assignment Agreement that was attached as an exhibit to

8    Protective's amended counterclaim.  (*See, e.g.*, Doc. No. 141 at 22, 24, 25, 26, 28; RUF ¶¶ 7, 8, 9,

9    19, 23.)  The copy of the Assignment Agreement that Cal Capital extensively quotes and relies on

10   is identical to the copies provided by Protective and Portfolio in support of their pending motions.

11   "In this context, defendant's authenticity objection rings hollow . . . ."  *Bernstein*, 670 F. Supp. 3d

12   at 1030; *see also Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 776 (9th Cir. 2002) ("We now hold

13   that when a document has been authenticated by a party, the requirement of authenticity is

14   satisfied as to that document with regards to all parties, subject to the right of any party to present

15   evidence to the ultimate fact-finder disputing its authenticity.").  Accordingly, the court will

16   overrule Cal Capital's objection as to the authenticity of the Assignment Agreement, even though

17   the Agreement was provided as exhibits to deposition testimony submitted by Protective and

18   Portfolio.  *See Bernstein*, 670 F. Supp. 3d at 1031 ("For these reasons, the court will overrule

19   defendant's objections as to the authenticity of these letters, even though the letters were provided

20   to the court as exhibits to plaintiffs' counsel's declaration.").

21          Cal Capital's objections to evidence that the court does not rely on in resolving the

22   pending motions are overruled as having been rendered moot.  Finally, with the exception of the

23   objection to the Assignment Agreement discussed in more detail below, Cal Capital's few

24   remaining evidentiary objections so clearly lack merit that they deserve no further discussion and

25   are therefore also overruled.

26          Similarly, in connection with their respective reply briefs, Portfolio and Protective have

27   filed objections to certain evidence submitted by Cal Capital in support of its oppositions to their

28   motions.  (*See* Doc. No. 140-2–140-7; 143-2.)  Because, with few exceptions discussed below,

1    the court does not rely on the evidence that Protective has objected to in analyzing Protective's

2    motion for summary judgment and concluding that it must be denied, the court need not

3    substantively address the majority of Protective's evidentiary objections.  As to the few

4    objections to evidence that the court does rely on in analyzing Protective's pending motion, the

5    court will address those objections in its analysis below.  Similarly, because the court will grant

6    Portfolio's motion for summary judgment and would do so even if the court considered the

7    evidence submitted in opposition by Cal Capital that Portfolio has objected to, the court need not

8    substantively address Portfolio's evidentiary objections.

9                                   **LEGAL STANDARD**

10         Summary judgment is appropriate when the moving party "shows that there is no genuine

11   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

12   Civ. P. 56(a).

13         Each party's position, whether it be that a fact is disputed or undisputed, must be

14   supported by (1) "citing to particular parts of materials in the record, including depositions,

15   documents, electronically stored information, affidavits or declarations, stipulations (including

16   those made for purposes of the motion only), admissions, interrogatory answers, or other

17   materials"; or (2) showing that such materials "do not establish the absence or presence of a

18   genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

19   Fed. R. Civ. P. 56(c)(1)(A), (B).   The court may consider other materials in the record, even if

20   not cited by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F.*

21   *Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

22         When resolving cross-motions for summary judgment, the court has an "independent duty

23   to review each cross-motion and its supporting evidence . . .  to determine whether that evidence

24   demonstrates a genuine issue of material fact."  *Fair Hous. Council of Riverside Cnty., Inc. v.*

25   *Riverside Two*, 249 F.3d 1132, 1137 (9th Cir. 2001).  Therefore, each motion is evaluated

26   separately, "giving the nonmoving party in each instance the benefit of all reasonable inferences."

27   *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016) (citation omitted).  If the

28   moving party will bear the burden of proof on an issue at trial, "the movant must affirmatively

                                              9

demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  However, when the non-moving party will bear the burden of proof on an issue, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.*; *see also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (stating that when the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)); Fed. R. Civ. P. 56(c)(1)(B).  Indeed, after adequate time for discovery and upon motion, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322–23.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied."  *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr*, 285 F.3d at 773 ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

/////

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87 (citations omitted).

## ANALYSIS

### A.      Protective's Cross-Motion for Summary Judgment

The court will first address whether Protective is entitled to summary judgment in its favor on its breach of contract claim brought against Cal Capital, and then will address whether Protective is entitled to summary judgment in its favor on Cal Capital's claims.

1.      Protective's Breach of Contract Claim

Protective argues that there is no genuine dispute of material fact as to whether Cal Capital is liable to Protective for breach of contract, specifically breach of the Assignment Agreement and Trust Agreement.  (Doc. No. 138 at 13–17.)  A claim for breach of contract requires:  (1) the existence of a valid contract; (2) the cross-claimant's performance or excuse for non-performance; (3) the cross-defendant's breach; and (4) damages. *See Cent. Valley Concrete, Inc. v. Road and Highway Builders, LLC*, No. 1:16-cv-01374-DAD-MSJ, 2017 WL 3172980, at

1    *3 (E.D. Cal. July 26, 2017); *Keveney v. Miss. Military Acad.*, 304 S.W.3d 98, 104 (2010)

2    (describing the elements of breach of contract under Missouri law).[16]

3                   a.      *Whether the Assignment and Trust Agreements Are Valid Contracts*

4            Protective argues that the Assignment Agreement is a valid contract obligating Cal Capital

5    to reimburse it for amounts that Protective was required to pay out under the terms of the VSCs.

6    (Doc. No. 138 at 14.)

7            Cal Capital argues that there is a genuine dispute of material fact as to the validity of the

8    Assignment Agreement under California law because "it was created to memorialize unlawful

9    activities between the parties." (Doc. No. 141 at 21; *see also id.* at 20 (citing *Tri-Q, Inc. v. Sta-Hi*

10   *Corp.*, 63 Cal. 2d 199, 216 (1965) ("[T]he general rule [is] that the courts will deny relief to either

11   party who has entered into an illegal contract . . . .")).  Relying on the declaration of Gerald

12   Glazer, Cal Capital argues that Protective's ultimate goal was to avoid "insurance regulation

13   laws" and that "money was taken off the top" by Protective while administering the VSCs. (*Id.* at

14   21–22.)

15           "Whether a contract is illegal or contrary to public policy is a question of law to be

16   determined from the circumstances of each particular case." *Meta Platforms, Inc. v. BrandTotal*

17   *Ltd.*, 605 F. Supp. 3d 1218, 1243–44 (N.D. Cal. 2022) (quoting *Dunkin v. Boskey*, 82 Cal. App.

18   4th 171, 183 (2000)).  Having considered the circumstances in this case as shown by the evidence

19   before the court on summary judgment, the court concludes there is no genuine dispute as to

20   whether the Assignment Agreement constitutes an illegal contract.  Cal Capital's reliance on the

21   Glazer declaration—the only evidence offered to support its invalidity argument—is unavailing

22   because that portion of the Glazer declaration merely asserts in conclusory fashion, and without

23   any foundation, that Protective's actions were illegal.  Critically, Glazer does not explain how or

24   why Protective's purported actions are unlawful, which laws or "insurance regulations"

25   _____

26   [16]  The court notes that the Assignment Agreement provides that it shall be governed by Missouri
     law. (*See* Doc. No. 138-2 at 244.)  Despite this, the parties cite almost exclusively California law
27   in their briefing.  Where California and Missouri law are similar in the relevant respects such that
     the court's resolution of the pending motions will not depend on which of those two states' laws
28   applies, the court will rely on California law as the parties have done.

Protective purportedly violated, or on what basis he has personal knowledge of such purported illegality.  The Glazer declaration is therefore not evidence that the Assignment Agreement is contrary to public policy.  *See id.* at 1245 (noting that courts should only "declare a contract void for being in contravention of sound public policy . . . in cases free from doubt") (quoting *Dunkin*, 82 Cal. App. 4th at 184).  Accordingly, the court concludes there is no genuine dispute of material fact as to whether the Assignment Agreement constituted a valid contract.[17]

As to the Trust Agreement, Cal Capital has not disputed the validity of that agreement. (*See* Doc. No. 141 at 21–22.)  Moreover, after reviewing the evidence before the court on summary judgment, the court has not discerned any grounds upon which to find the Trust Agreement to be invalid.  Accordingly, the court also concludes there is no genuine dispute of material fact as to whether the Trust Agreement constituted a valid contract.[18]

> b.      *Whether Protective Performed Under the Assignment and Trust*
> *Agreements*

It is undisputed that prior to the sale of Sacramento Infiniti in 2017, Protective had established the Trust Account, was depositing VSC premiums into the Trust Account, was appropriately approving and paying out VSC claims, and had been timely reimbursed with regard to those claims by Cal Capital using funds in the Trust Account—all of which was required under

---

[17]  Cal Capital also argues that "none of the boxes in *Attachment A* [of the Assignment Agreement] are checked, requiring the court to interpret the contract and therefore provid[ing] additional evidence of disputed issues of material fact."  (Doc. No. 141 at 22.)  However, contract interpretation is a question of law under both California and Missouri law.  *See Wiseblood v. Mut. of Omaha Ins. Co.*, No. 2:18-cv-03082-KJM-CKD, 2019 WL 3235024, at *2 (E.D. Cal. July 18, 2019); *Pitts v. Grinnell Select Ins. Co.*, No. 22-cv-00106-SNLJ, 2023 WL 156858, at *2 (E.D. Mo. Jan. 11, 2023).  In the court's view, the boxes in Attachment A which Cal Capital argues are purportedly unchecked are more accurately interpreted as bullet points indicating a list.  In any event, whether Attachment A reflects a menu of unchecked boxes or a list of bullet points is not a dispute of material fact, which would preclude the court from concluding that the Assignment Agreement is a valid contract.

[18]  It is unclear whether Cal Capital argues that the Trust Agreement was also an illegal contract for the same reasons as the Assignment Agreement.  (*See* Doc. No. 141 at 21–22.)  In any event, for the reasons discussed above with regard to the Assignment Agreement, the court concludes there is no genuine dispute of material fact as to whether the Trust Agreement constituted an illegal contract.

the Assignment Agreement and Trust Agreement.  (RUF ¶¶ 13–19.)  There is thus no genuine dispute of material fact as to whether Protective had performed under those contracts *prior to* the sale of Sacramento Infiniti.  Protective has therefore established its own performance.  Furthermore, it is undisputed that Cal Capital instructed Cetera to stop permitting Protective to withdraw funds from the Trust Account after the sale of Sacramento Infiniti.  (RUF ¶ 20.)  The issue is whether Cal Capital's conduct in this regard constituted a breach of its contractual obligations, and if so, whether Protective's conduct in approving allegedly invalid VSC claims constitutes a breach that excuses Cal Capital's breach of the contracts.  The court proceeds by addressing the following two related questions in turn:  (1) whether Cal Capital had any contractual right to refuse to reimburse Protective for invalid or inappropriately adjudicated claims; and (2) whether a genuine dispute of material fact exists as to whether Protective improperly approved invalid claims after the sale of Sacramento Infiniti, thereby putting itself in breach and excusing Cal Capital's non-performance under the contracts.

i.       Whether Cal Capital Had A Contractual Right to Cease

Reimbursement Due to Protective's Approval of Invalid Claims

In its pending motion, Protective argues that the written agreements expressly provide that Protective alone shall adjudicate VSC claims, that no provision in any of the agreements authorizes Cal Capital to review claims of $500 or higher, and that reforming the contracts to include such a provision would be contrary to California public policy in light of the undisputed fact that Cal Capital is not licensed to adjust VSC claims.  (Doc. No. 138; *see also* RUF ¶ 15.)

Cal Capital argues that it had the right under the Assignment Agreement and Trust Agreement to review and provide final approval on claims of $500 or higher.  (Doc. No. 141 at 24.)  Yet Cal Capital does not point to any provision in any written agreement providing it with such authority.  Moreover, the court has reviewed the parties' agreements and found none.  Instead, to support its argument, Cal Capital provides as evidence a copy of notes taken at a Cal Capital board meeting on December 31, 2011, which merely state without further explanation: "all claims over $500 in or out of store auto authorize [sic]."  (Doc. No. 141-2 at 22.)  The only other evidence provided by Cal Capital in support of its contention in this regard are the

declarations of Gerald Glazer and Jerry Colamartino.  According to each of those declaration, Cal Capital's owners, McCraw and Glazer, had the "authority" at Cal Capital board meetings to review and provide final approval on claims of $500 or more.[19]  (Doc. Nos. 141-4 at 4; 141-5 at 3.)  But Cal Capital does not explain how its own internal practice in this regard could modify the terms of the Assignment Agreement, particularly in light of the provision in the Assignment Agreement stating that it "may only be modified in writing in accordance with the mutual and express consent of all parties hereto."  (Doc. No. 138-2 at 245.)

As noted above, the Assignment Agreement by its own terms is governed by Missouri law.  (*See id.* at 244.)  "Under Missouri law, a written agreement cannot be modified by the later conduct of the parties unless the evidence shows mutual assent and additional consideration for the modification."  *Cordry v. Vanderbilt Mortg. & Fin., Inc.*, 445 F.3d 1106, 1111 (8th Cir. 2006).  Here, Cal Capital has presented no evidence on summary judgment of additional consideration provided for any modification of the agreement permitting it to review and have final approval for claims of $500 or more.  Accordingly, the court finds based on the evidence before it on summary judgment that there is no genuine dispute that Cal Capital did not have such a contractual right under the Assignment Agreement.  *See id.* (affirming the district court's grant of summary judgment in the defendant's favor where the plaintiff "present[ed] no evidence that he provided consideration to [the defendant] in return for" modifying the agreement at issue).

Moreover, the only relevant provision in a written agreement identified by Cal Capital is § V of the Investment Policy Statement Addendum ("the Addendum") signed by Chesterfield and Cal Capital.  (*See* Doc. No. 141-2 at 15.)  That provision states that Cetera will "[o]btain written

---

[19]  In its response to Protective's statement of undisputed facts, Cal Capital cites as evidence the unverified answer by Portfolio to Cal Capital's cross-claim.  (*See, e.g.*, RUF ¶ 4.)  In its answer, Portfolio admitted that Cal Capital's "consent was needed to pay any claims exceeding $500.00."  (Doc. No. 28 at 4.)  However, in its answer, Portfolio also denied any responsibility for claims adjudication, stating that Protective was the administrator of the VSCs.  (*Id.* at 3.)  That is, Portfolio's admission is that *Protective*—not Portfolio—needed Cal Capital's consent to pay claims exceeding $500.  Cal Capital does not explain or cite any authority to support its contention that Portfolio's admission in an unverified answer regarding Protective's conduct may be relied upon as evidence in opposition to Protective's motion for summary judgment.  The court will not consider Portfolio's admission as evidence in this regard.

1    authorization from [Cal Capital] and [Chesterfield] prior to execution of every transaction." (*Id.*

2    at 15.)  However, the Addendum then states that it "is intended to be used as a guideline rather

3    than a rigid statement of policy from which there can be no deviation." (*Id.* at 16.)  The

4    Addendum further states that "it is anticipated that any important deviations . . . will be brought to

5    the attention of *Chesterfield*," not Cal Capital. (*Id.*) (emphasis added).  Additionally, the

6    provisions of the Addendum are clearly intended to guide only the investment of the funds within

7    the Trust Account.  That is, nothing in the text of the Addendum suggests it governs withdrawals

8    related to reimbursement payments.  For each of these reasons, Cal Capital's reliance on the

9    Addendum to support its argument that it had a contractual right to halt reimbursements paid from

10   the Trust Account is unavailing.

11        The court notes, however, that there is a provision in the Trust Agreement that neither

12   party mentioned nor addressed in their respective briefings that appears to bear on this question.

13   Specifically, the Trust Agreement states that "[o]nly *appropriate* claims . . . will be withdrawn

14   from the account of [Cal Capital] until the risk of all the coverages subject to the reinsurance

15   agreement between [Chesterfield/Protective] and [Cal Capital] have expired." (*Id.* at 4)

16   (emphasis added).  Absent any briefing on this issue, and given that the parties have not

17   submitted evidence on summary judgment to suggest otherwise, it appears from the plain

18   meaning of this provision of the Trust Agreement that Protective is entitled to request

19   reimbursement only for "appropriate" claims. *Cf. Hoban v. Nova Cas. Co.*, 335 F. Supp. 3d

20   1192, 1201–02 (E.D. Cal. 2018) ("Insurance policies are construed under the typical rules of

21   contract law, which require looking 'first to the language of the contract in order to ascertain its

22   plain meaning or the meaning a layperson would ordinarily attach to it.'") (quoting *Waller v.

23   Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995)).

24                    ii.    Whether Protective Approved and Requested Reimbursement for

25                           Inappropriate Claims

26        Protective argues that the evidence it has provided on summary judgment establishes the

27   propriety of its claims adjudications process, that that evidence is undisputed, and that Cal Capital

28   has failed to come forward with any admissible evidence to the contrary. (Doc. No. 138 at 13–

                                                      16

17.)  However, according to the declarations of Glazer and Colamartino, after the sale of Sacramento Infiniti, Protective began paying out claims at "nearly twice the monthly average of the preceding [ ] years."[20]  (Doc. Nos. 141-4 at 4; 141-5 at 3.)  Protective contends in its reply that these claims were higher than previous months' because "Sacramento Infiniti was no longer repairing vehicles itself under the VSCs after its sale of assets in June 2017, thus no longer controlling costs on the front end."  (Doc. No. 143 at 11.)  But Protective does not cite any evidence in support of this contention.  Moreover, Protective's explanation in this regard itself underscores the genuine dispute of material fact as to whether the claim payments—and thus the corresponding requests for reimbursement—were appropriate.

In moving for summary judgment in its favor, Protective bears the burden of showing that there exists no genuine dispute of material fact as to each element of its breach of contract claim. By not referencing the provision in the Trust Agreement identified by the court and discussed above, and by failing to show no genuine dispute as to the propriety of its claims adjudications, Protective has failed to carry that burden.  Accordingly, Protective's motion for summary judgment in its favor on its own breach of contract claim will be denied.[21]

2.   Cal Capital's Breach of Contract Claim

Protective also moves for summary judgment on Cal Capital's cross-claim for breach of contract.  In that cross-claim, Cal Capital asserts that Protective breached the Assignment

---

[20] Protective objects to many statements in the Glazer declaration as being conclusory and lacking foundation, but it does not object to Glazer's statement that VSC claims nearly doubled immediately after the 2017 sale of Sacramento Infiniti.  (Doc. No. 143 at 7–8.)  Indeed, Glazer's statement in that regard is not conclusory, nor is there a lack of foundation or personal knowledge in light of Glazer's ownership interest in both Sacramento Infiniti and Cal Capital.  Protective does object to Colamartino's identical statement as conclusory and lacking foundation (Doc. No. 143 at 8–9), but Colamartino's statement in this regard is also not conclusory.  Nor is there a lack of foundation or personal knowledge:  Colamartino served as Sacramento Infiniti's general manager from 2008 to 2017, then stayed on as general manager for another year under the new ownership.  (Doc. No. 141-5 at 2–3.)

[21] Protective disputes the admissibility of other evidence submitted by Cal Capital that purportedly bears on the elements of performance and breach.  (*See, e.g.*, Doc. No. 143 at 9–11.) Having already found that Protective has failed to carry its burden and that its pending motion will therefore be denied, the court need not consider the admissibility of that evidence.

Agreement and Trust Agreement by approving and receiving reimbursement on inappropriately adjudicated VSC claims.  (Doc. No. 138 at 13.)  To prevail on its motion in this regard, Protective must show that on summary judgment there is no genuine dispute of material fact as to at least one element of Cal Capital's cross-claim and that Protective is entitled to judgment in its favor on the cross-claim.

Although the first element, the existence of a valid contract, is satisfied as discussed above, the court has already found that a genuine dispute of material fact exists with regard to the second and third elements of performance and breach.  As also discussed above, Cal Capital has shown a genuine dispute as to its performance and Protective's breach.  The only remaining issue is whether Cal Capital has also shown a genuine dispute as to its damages.

The court easily concludes that Protective has failed to meet its burden as to the element of damages.  There is a dispute of material fact as to whether the claim payments with regard to which Protective requested reimbursement were appropriately adjudicated, or whether those claim payments were inappropriately inflated.  Had Cal Capital used funds from the Trust Account to reimburse Protective for inappropriately adjudicated claims, Cal Capital would have been damaged.

Thus, a genuine dispute of material fact exists as to each element of Cal Capital's breach of contract claim.  Accordingly, Protective's motion for summary judgment in its favor as to that cross-claim is denied.

3.      Cal Capital's Breach of Fiduciary Duty Claim

"The elements of a claim for breach of fiduciary duty [under California law] are (1) the existence of fiduciary relationship, (2) its breach, and (3) damage proximately caused by that breach."  *O'Neal v. Stanislaus Cnty. Emps.' Ret. Ass'n*, 8 Cal. App. 5th 1184, 1215 (2017); *see also Lockton Cos., LLC v. Willis Ams. Admin., Inc.*, No. 23-cv-00717-DGK, 2024 WL 1329927, at *5 (W.D. Mo. Mar. 27, 2024) (listing the same elements under Missouri law).

a.      *Whether A Fiduciary Relationship Existed*

In moving for summary judgment on Cal Capital's breach of fiduciary duty cross-claim, Protective argues that it owed no fiduciary duty to Cal Capital because in a reinsurance

1    relationship, neither party owes the other a fiduciary duty.  (Doc. No. 138 at 17) (citing *Cal. Joint*

2    *Powers Ins. Auth. v. Munich Reins. Am. Inc.*, No. 08-cv-00956-DSF-RZX, 2008 WL 1885754, at

3    *4 (C.D. Cal. Apr. 21, 2008)).  In opposing Protective's motion, Cal Capital argues that the Trust

4    Agreement established a fiduciary relationship.  (Doc. No. 141 at 25.)

5         The existence of a fiduciary duty is a question of law, while the breach of that duty is a

6    question of fact.  *Gulf Ins. Co. v. First Bank*, No. 2:08-cv-00209-LKK-JFM, 2008 WL 2383927,

7    at *3 (E.D. Cal. June 4, 2008); *Hibbs v. Berger*, 430 S.W.3d 296, 312 (Mo. Ct. App. 2014).

8    Under California law, "before a person can be charged with a fiduciary obligation, he must either

9    knowingly undertake to act on behalf and for the benefit of another, or must enter into a

10   relationship which imposes that undertaking as a matter of law."  *Comm. on Children's*

11   *Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 221 (1983), *superseded on other grounds as*

12   *stated in Branick v. Downey Sav. & Loan Ass'n*, 39 Cal. 4th 235, 242 (2006).  "Fiduciary duties

13   arise as a matter of law 'in certain technical, legal relationships,'" including that between "trustee

14   and beneficiary . . . ."  *Oakland Raiders v. Nat'l Football League*, 131 Cal. App. 4th 621, 632

15   (2005) (citation omitted).  Missouri law on fiduciary duties is similar to California law in this

16   regard.  *See John R. Boyce Family Tr. v. Snyder*, 128 S.W.3d 630, 636 (Mo. Ct. App. 2004).

17        Here, the Assignment Agreement obligated Cal Capital to "establish, or cause to be

18   established, one or more trust accounts" of which Protective would be the trustee.  (Doc. No. 138-

19   2 at 241.)  To that end, the Trust Agreement states that Protective "is appointed trustee and is

20   instructed to set up a trust account with [Cetera] for the benefit of [Cal Capital] . . . ."  (Doc.

21   No. 141-2 at 4.)  Even if Protective is correct that a reinsurance relationship does not give rise to a

22   fiduciary relationship between reinsurer and reinsured—an issue the court need not and therefore

23   does not consider in this order—Protective does not explain or provide any authority suggesting

24   why this would preclude the parties from contracting so as to establish such a duty.  To the

25   contrary, at least one other federal circuit court has found that a similar trust agreement created a

26   fiduciary duty owed by an insurance company to a reinsurance company with respect to a trust

27   account funded by car insurance premiums.  *See Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs.,*

28   *Inc.*, 787 F.3d 716, 726–30 (5th Cir. 2015).  Thus, the court concludes that the Assignment

1  Agreement and Trust Agreement suffice to show the existence of a fiduciary relationship between

2  Protective and Cal Capital as to the management of the Trust Account.[22]

3       Therefore, based on the evidence presented on summary judgment, the court concludes

4  that Cal Capital has established the first element of its fiduciary duty claim—the existence of a

5  fiduciary relationship.

6               b.  *Whether Protective Breached Its Fiduciary Duty*

7       For the same reasons discussed above with regard to whether Protective breached the

8  Assignment Agreement and Trust Agreement by seeking reimbursement for inappropriate claims,

9  the court concludes that there is a genuine dispute of material fact as to whether Protective

10  breached its fiduciary duty by requesting to be reimbursed with funds from the Trust Account

11  after approving inappropriate claims.  Thus, Protective's motion for summary judgment in its

12  favor on Cal Capital's breach of fiduciary duty cross-claim will also be denied.

13       Nevertheless, the court will briefly address an additional argument Protective raises in its

14  pending motion, referencing the "follow the fortunes" doctrine.  (Doc. No. 138 at 17) (quoting

15  *Zenith Ins. Co. v. O'Connor*, 148 Cal. App. 4th 998, 1007 (2007) ("It is well settled that where

16  . . . a reinsurance contract fails to provide otherwise, a reinsurer has no control over claims

17  settlement.  Consequently, if the ceding insurer decides to settle and pay a claim, the reinsurer

18  cannot raise coverage defenses to avoid paying its share of the loss.  Absent fraud or collusion

19  with the insured, the reinsurer must 'follow the fortunes' of the ceding insurer on any claims

20  under the policy . . . .")).  The full sentence from the court's decision in *Zenith* cited in part by

21  Protective reads:  "Absent fraud or collusion with the insured, the reinsurer must 'follow the

22  fortunes' of the ceding insurer on any claims under the policy . . . [sic] and most reinsurance

---

[22]  Protective argues that the previously-assigned district judge had already concluded that
Protective did not owe any fiduciary duty to Cal Capital.  (Doc. No. 138 at 17–18; *see also* Doc.
No. 100 at 8–9.)  However, the undersigned concludes that the prior order denying Cal Capital's
motion to dismiss is not to the contrary.  In that order, the court concluded only that a reinsurance
relationship does not inherently give rise to a fiduciary duty, and that "Cal Capital's role as
reinsurer [therefore] does not prevent Protective from filing suit against it."  (Doc. No. 100 at 9.)
The court did not consider in that order whether a fiduciary relationship had separately been
established by the Trust Agreement because it had already concluded that a trustee was not
prohibited from suing its beneficiary.  (*Id.*)

1   contracts, including the one before us, expressly so provide." *Zenith*, 148 Cal. App. 4th at 1007.

2   Here, Protective has not pointed to any express "follow the fortunes" provision in any contract

3   between it and Cal Capital, nor has the court identified any such provision upon reviewing the

4   evidence submitted by the parties on summary judgment. *Cf. Nat'l Am. Ins. Co. of Cal. v.*

5   *Certain Underwriters at Lloyd's London*, 93 F.3d 529, 536 (1996) (noting that "the California

6   Supreme Court [had] reiterated in dictum that absent such a clause in the reinsurance contract, a

7   reinsurer has the right to assert those coverage defenses that might have been available to the

8   reinsured"); *The Am. Ins. Co. v. Am. Re-Ins. Co.*, No. 05-cv-01218-JSW, 2006 WL 3412079, at

9   *5 (N.D. Cal. Nov. 27, 2006) ("The Court finds that the majority of courts addressing this issue,

10  and the better reasoned opinions, have rejected the proposition that the 'follow the settlements' or

11  'follow the fortunes' doctrine may be read into every reinsurance policy as a matter of law.").

12        Indeed, as discussed above, the Trust Agreement expressly states that "[o]nly appropriate

13  claims" shall be reimbursed using funds from the Trust Account. The court therefore concludes

14  that Protective has failed to establish that any contracts between itself and Cal Capital contained a

15  "follow the fortunes" provision, such that the granting of summary judgment in Protective's favor

16  on the element of breach would be appropriate. *Cf. Tellone Prof'l Ctr., LLC v. Allstate Ins. Co.*,

17  562 F. Supp. 3d 757, 769 (C.D. Cal. Jan. 18, 2022) (distinguishing the court's decision in *Zenith*

18  because "[t]here, per the terms of the reinsurance contract, the insurer 'expressly retained the

19  *exclusive* power to investigate, defend and settle any claim on such terms as it, *in its discretion*,

20  deemed expedient," whereas "[h]ere, the reinsurance contract has simply provided otherwise").[23]

21                 c.    *Causation and Damages*

22        Protective presents no argument in its motion addressing the causation and damages

23  elements of Cal Capital's breach of fiduciary duty claim. Moreover, the court easily finds

24  genuine disputes of material fact as to these elements for the same reasons discussed above in

---

26  [23] Protective points to the provision in the Dealership Agreement stating that "Dealership
    acknowledges that [Protective] shall authorize covered repairs without the approval of

27  Dealership." (*See* Doc. No. 141-2 at 9.) But the Dealership Agreement was between Portfolio,
    Protective, and Sacramento Infiniti. (*Id.*) Protective does not explain the relevance of this

28  provision in an agreement to which Cal Capital was not a party.

1    regard to the breach of contract claims.  Accordingly, because genuine disputes exist as to each

2    element of the claim, Protective's motion for summary judgment in its favor as to Cal Capital's

3    breach of fiduciary duty claim will be denied.

4        4.    Cal Capital's Breach of Implied Covenant of Good Faith and Fair Dealing Claim

5        The covenant of good faith and fair dealing is implied by law in every contract.  *Linde,*

6    *LLC v. Valley Protein, LLC*, No. 1:16-cv-00527-DAD-EPG, 2019 WL 3035551, at *9 (E.D. Cal.

7    July 11, 2019).  The elements of a claim for breach of the implied covenant of good faith and fair

8    dealing under California law are:  "(1) the parties entered into a contract; (2) the plaintiff fulfilled

9    his obligations under the contract; (3) any conditions precedent to the defendant's performance

10   occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of

11   the contract; and (5) the plaintiff was harmed by the defendant's conduct."  *Woods v. Merkelbach*,

12   No. 2:23-cv-02798-DAD-CKD, 2024 WL 1624171, at *7 (E.D. Cal. Apr. 15, 2024).  In the

13   insurance context, "[t]o be liable for breaching the covenant of good faith and fair dealing, the

14   insurer's conduct must go beyond incorrectly denying coverage—'bad faith implies unfair

15   dealing rather than mistaken judgment.'"  *Glob. Hawk Ins. Co. (RRG) v. Wesco Ins. Co.*, 424 F.

16   Supp. 3d 848, 860 (C.D. Cal. 2019) (quoting *Congleton v. Nat'l Union Fire Ins. Co.*, 189 Cal.

17   App. 3d 51, 59 (1987)).

18       In its motion for summary judgment, Protective argues that Cal Capital's claim for breach

19   of the implied covenant of good faith and fair dealing fails as a matter of law because Cal Capital

20   has provided no evidence on summary judgment of bad faith, rather than mistaken judgment.

21   (Doc. No. 138 at 18.)  Protective argues that there can be no claim of self-dealing here because

22   more lenient claims adjudication would only have benefitted the vehicle owners submitting the

23   claims, not Protective.  (*Id.*)  In its opposition, Cal Capital does not meaningfully respond to

24   Protective's arguments in this regard.

25       "The 'ultimate test' in bad faith liability claims is whether the insurer's . . . conduct was

26   unreasonable."  *Ruiz Food Prods., Inc. v. Catlin Underwriting U.S., Inc.*, No. 1:11-cv-00889-

27   BAM, 2012 WL 4050001, at *15 (E.D. Cal. Sept. 13, 2012) (quoting *Nieto v. Blue Shield of Cal.*

28   *Life and Health Ins. Co.*, 181 Cal. App. 4th 60, 86 (2010)).  Neither party has cited authority

1   dealing with claims arising in the reinsurance context as are involved in this case.[24]  However, the

2   court notes that in the insurance context, "[u]nder California law, a 'court can conclude as a

3   matter of law that an insured's denial of a claim is not unreasonable, so long as there existed a

4   genuine issue' or 'genuine dispute' about coverage, whether the dispute is legal or factual."

5   *Argenal v. Reassure Am. Life Ins. Co.*, No. 13-cv-01947-CRB, 2014 WL 1678008, at *8 (N.D.

6   Cal. Apr. 28, 2014) (quoting *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001)).

7   Consequently, an insurer denying a claim "due to the existence of a genuine dispute with its

8   insured as to the existence of coverage liability or the amount of the insured's coverage claims is

9   not liable in bad faith even though it might be liable for breach of contract."  *Wilson v. 21st

10  Century Ins. Co.*, 42 Cal. 4th 713, 754 (2007).

11         Here, as discussed above, Cal Capital has come forward with evidence that the amount of

12  claims paid out doubled after the sale of Sacramento Infiniti in 2017, and Protective has presented

13  evidence regarding the propriety of its claims adjudication process (*see* Doc. No. 138-4 at 2–3).

14  Consequently, a genuine dispute exists here "as to the existence of coverage liability or the

15  amount of the insured's coverage claims."  *Id.*  The court therefore concludes that Protective

16  cannot be liable for bad faith.  Accordingly, Protective's motion for summary judgment in its

17  favor on Cal Capital's claim for breach of the implied covenant of good faith and fair dealing will

18  be granted.  *Cf. StarStone Nat'l Ins. Co. v. Indep. Cities Risk Mgmt. Auth.*, No. 19-cv-01130-PA,

19  2020 WL 4341716, at *4–5 (C.D. Cal. Apr. 7, 2020) ("[Because] a genuine dispute as to

20  coverage, or the amount of damages, is sufficient on its own to preclude an insurers' liability for

21  tort damages, the Court concludes that [the reinsurer] is entitled to summary judgment on [the

22  reinsured's] bad faith claim."); *Payaslyan v. Allstate Indem. Co.*, 610 F. App'x 659, 659–60 (9th

23

24  ───────────────

    [24]  The court notes that several district courts in the Ninth Circuit have held that an insurer may
25  not bring a claim for breach of the implied covenant of good faith and fair dealing against its
    reinsurer.  *See, e.g.*, *Cal. Joint Powers Ins. Auth.*, 2008 WL 1885754, at *2–5.  This action
26  presents the opposite circumstances, i.e., the reinsurer, Cal Capital, is bringing such a claim
    against the reinsured, Protective.  Because Protective did not raise the issue in its motion for
27  summary judgment, and because the court will grant Protective's motion for summary judgment
    in its favor on this claim on other grounds, the court does not consider whether a reinsurer is
28  precluded from bringing such a claim against its reinsured under California law.

1    Cir. 2015) (affirming the district court's grant of summary judgment in favor of the insurance

2    company on the plaintiff's claim for breach of the implied covenant of good faith and fair dealing

3    where "there was a genuine dispute as to the amount owed to [the plaintiff]").[25]

4           5.      Cal Capital's UCL Claim

5           Protective also moves for summary judgment in its favor on Cal Capital's UCL claim

6    brought against it.  (Doc. No. 138 at 19.)  Protective argues that Cal Capital's UCL claim is

7    untethered to any California public policy.  (*Id.*)  In response, Cal Capital argues that its claim is

8    brought under the unlawful prong of the UCL and that its claim is derivative of, and dependent

9    upon, its other claims which have been discussed above:  breach of contract, breach of fiduciary

10   duty, and breach of the covenant of good faith and fair dealing.  (Doc. No. 141 at 30.)

11          Because the court is granting summary judgment in favor of Protective on Cal Capital's

12   claim for breach of the covenant of good faith and fair dealing, that claim cannot serve as the

13   basis of a UCL claim under the unlawful prong.  *See Travelers Indem. Co. of Conn. v. Walking U*

14   *Ranch, LLC*, No. 18-cv-02482-CAS-GJS, 2022 WL 762303, at *20 & n.10 (C.D. Cal. Mar. 10,

15   2022) (granting the plaintiff's motion for summary judgment and finding that the

16   counterclaimant's UCL claim was "barred because there has been . . . no breach of the implied

17   covenant of good faith and fair dealing," in part "because there can be no bad faith when there is

18   a genuine dispute between the parties").

19          Nor can Cal Capital's breach of contract claim serve as a UCL predicate under the

20   unlawful prong.  "A breach of contract may form the basis for UCL claims only if '*it also*

21   *constitutes conduct that is "unlawful, or unfair, or fraudulent."*'"  *Conder v. Home Sav. of Am.*,

22   680 F. Supp. 2d 1168, 1176 (C.D. Cal. 2010) (quoting *Puentes v. Wells Fargo Home Mtg., Inc.*,

23   160 Cal. App. 4th 638, 645 (2008)); *see also Shroyer v. New Cingular Wireless Servs., Inc.*, 622

24   F.3d 1035, 1044 (9th Cir. 2010) ("[A] common law violation such as breach of contract is

25   insufficient.  Because Shroyer does not go beyond alleging a violation of common law, he fails to

26   state a claim under the unlawful prong of § 17200.").  As discussed above regarding Cal Capital's

27

28   _____

[25]  Citation to this and other unpublished Ninth Circuit opinions in this order is appropriate
pursuant to Ninth Circuit Rule 36-3(b).

1   claim for breach of the implied covenant of good faith and fair dealing, there is no evidence

2   before the court on summary judgment that Protective's conduct was otherwise unfair or

3   fraudulent.

4       For the same reason, Cal Capital's claim for breach of fiduciary duty cannot serve as a

5   UCL predicate under the unlawful prong.  *See Prostar Wireless Grp., LLC v. Domino's Pizza,*

6   *Inc.*, No. 16-cv-05399-WHO, 2017 WL 67075, at *6 (N.D. Cal. Jan. 6, 2017) ("Since a breach of

7   fiduciary duty is a common law claim, Prostar's UCL claim cannot stand on this ground.");

8   *Goodness Films, LLC v. TV One, LLC*, No. 12-cv-08688-GW-JEM, 2013 WL 12145508, at *13

9   (C.D. Cal. Feb. 28, 2013) ( "Plaintiffs' UCL claim does not allege that this breach of fiduciary

10   duty was coupled with a statutory violation.").[26]

11       Accordingly, Protective's motion for summary judgment in its favor on Cal Capital's

12   UCL claim will be granted.[27]

13       6.    Cal Capital's Claim for Declaratory Relief

14       Cal Capital brings a claim for declaratory relief seeking a declaration "that [Protective]

15   does not have an unfettered right to withdraw funds from the Trust Account and that [Protective]

16   may not pay claims that exceed $500.00 without the authorization of [Cal Capital]."  (Doc.

17   No. 16 at 15.)  Protective moves for summary judgment on this claim on the grounds that Cal

18   Capital is not entitled to a reformation of contract for the reasons discussed above.  (Doc. No. 138

19   at 20.)

20   /////

21

22   [26]  The court notes that multiple district courts in the Ninth Circuit have concluded that a claim
     for breach of fiduciary duty may serve as a UCL predicate.  *See, e.g.*, *Iconix, Inc. v. Tokuda*, 457

23   F. Supp. 2d 969, 996 (N.D. Cal. 2006).  However, those decisions were largely issued before the
     Ninth Circuit's decision in *Shroyer* or rely on decisions themselves issued before *Shroyer*.

24   Therefore, the court does not find those decisions to be persuasive on this point.

25   [27]  In its cross-claim, Cal Capital also alleges that Protective is liable under the UCL for failing to

26   provide specified information upon request.  (Doc. No. 16 at 11.)  Cal Capital appears to abandon
     this part of its UCL claim in its opposition to Protective's motion.  (*See* Doc. No. 141 at 29–30.)

27   In any event, it is undisputed that Protective has provided all such information upon request.
     (RUF ¶¶ 21–22.)  Accordingly, Protective's motion for summary judgment in its favor as to Cal

28   Capital's UCL claim will be granted in its entirety.

In its opposition to the pending motion, Cal Capital "requests the court provide declaratory relief as to the validity and enforceability of the" various contracts at issue in this action. (Doc. No. 141 at 31.) Cal Capital also "requests the court provide declaratory relief as to the 'Interpretation' of the [Assignment] Agreement since a significant portion of the Agreement . . . has been left blank . . . ." (*Id.*) However, Cal Capital's cross-claim did not seek this relief and the belated request provides no basis upon which to deny Protective's motion for summary judgment as to the claims for declaratory relief that do appear in Cal Capital's cross-claim.

However, as discussed above, the Trust Agreement does state that only "appropriate" claims may be reimbursed with funds from the Trust Account. Protective has therefore failed to show the lack of a genuine dispute as to its "unfettered right" to withdraw funds from the Trust Account. Accordingly, Protective's motion for summary judgment in its favor as to Cal Capital's claim for declaratory relief will be denied.

**B.      Portfolio's Cross-Motion for Summary Judgment**

Cal Capital also asserts claims against cross-defendant Portfolio for breach of contract, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, and violation of the UCL. (Doc. No. 16 at 11–14.) Portfolio moves for summary judgment in its favor on all of Cal Capital's claims brought against it on the grounds that all are premised on alter ego liability, and there is no genuine dispute as to the fact that Portfolio is not an alter ego of Protective. (Doc. No. 136 at 3.) Cal Capital argues that its claims for breach of the covenant of good faith and fair dealing and for violation of the UCL are not based solely on alter ego liability. (PUF ¶ 148.)

1.      <u>Cal Capital's Claim for Breach of Contract</u>

It is undisputed that Cal Capital and Portfolio did not sign any written agreements with one another. Instead, Cal Capital argues that Portfolio is liable for breach of contract based on the contract between Cal Capital and Protective because Portfolio is the alter ego of Protective. (Doc. No. 139 at 25–28.)

Alter ego liability permits a plaintiff to "pierce the corporate veil" when certain circumstances are present. *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 898 (9th Cir. 2021). Under California law, alter ego liability requires two conditions to

1   be met: "First, where 'there is such a unity of interest and ownership that the individuality, or

2   separateness, of the said person and corporation has ceased;' and, second, where 'adherence to the

3   fiction of the separate existence of the corporation would . . . sanction a fraud or promote

4   injustice." *In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010) (quoting *Wood v. Elling*

5   *Corp.*, 20 Cal. 3d 353, 365 n.9 (1977)).

6          Courts analyze a variety of factors when considering the first condition, unity of interest.

7   *Misik v. D'Arco*, 197 Cal. App. 4th 1065, 1073 (2011).

8                  Among the many factors to be considered in applying the doctrine
                   are one individual's ownership of all stock in a corporation; use of
9                  the same office or business location; commingling of funds and other
                   assets of the individual and the corporation; an individual holding out
10                 that he is personally liable for debts of the corporation; identical
                   directors and officers; failure to maintain minutes or adequate
11                 corporate records; disregard of corporate formalities; absence of
                   corporate assets and inadequate capitalization; and the use of a
12                 corporation as a mere shell, instrumentality or conduit for the
                   business of an individual. This list of factors is not exhaustive, and
13                 these enumerated factors may be considered with others under the
                   particular circumstances of each case.
14

15   *Id.* (internal citations omitted). As to the second condition, "[t]he test for this requirement is that

16   if the acts are treated as those of the corporation alone, it will produce an unjust or inequitable

17   result." *Id.*

18          Based on the evidence before the court on summary judgment, the court finds that

19   Portfolio has met its burden of showing that no genuine dispute of material fact exists with regard

20   to the first condition of the alter ego test—unity of interest. Portfolio has provided evidence that

21   it and Protective use different offices, have separate officers and directors, and are owned by

22   separate parent companies. (*See* PUF ¶¶ 10, 12, 13, 15–20.) Cal Capital, on the other hand, has

23   not submitted evidence to show otherwise. In this regard, in support of its assertion of alter ego

24   liability, Cal Capital submits evidence consisting primarily of conclusory declarations. *See*

25   *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-

26   serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a

27   genuine dispute of material fact."). To the extent Cal Capital has provided detailed facts and

28   supporting evidence, that evidence—such as, showing that a handful of Portfolio's current

27

1    employees worked for Protective in the past; showing the use of Portfolio's logo on agreements

2    between Protective and Cal Capital; and the existence of a written indemnification agreement

3    between Portfolio and Protective without any suggestion of a less-than-arms-length

4    relationship—is insufficient to create a genuine dispute of material fact.  *See Azami v. Ohio Nat'l*

5    *Life Assurance Corp.*, No. 19-cv-02504-MCS-SP, 2021 WL 4100103, at *4–5 (C.D. Cal. Feb. 23,

6    2021) ("Using 'Ohio National Financial Services' on correspondence and sharing 'a number of

7    corporate officers and directors,' but not all of the same corporate officers and directors, does not

8    establish that ONFS is the alter ego of ONLAC. . . .  Based on the above, the Court grants

9    summary judgment and finds that ONFS is not the alter ego of ONLAC."); *Eastwest United Grp.,*

10    *Inc. v. Bell Flavors and Fragrances*, No. 08-cv-04677-SJO-FMO, 2010 WL 11515302, at *9

11    (C.D. Cal. Jan. 22, 2010) (granting the defendant's motion for summary judgment in its favor and

12    finding no alter ego liability where "there is no evidence of inadequate capitalization, a failure to

13    observe corporate formalities, the use of same offices or employees, the use of [the defendant] as

14    a mere shell, a failure to maintain an arm's length relationship, the commingling of funds or

15    assets, or of any other factor tending to destroy the individuality of such corporations").

16    Separately, Portfolio has also shown that no genuine dispute exists as to the second

17    condition of the alter ego test.  Indeed, Cal Capital did not address the second condition in its

18    opposition to Portfolio's motion for summary judgment.  Furthermore, having reviewed the

19    evidence before it on summary judgment, the court does not find any evidence suggesting an

20    unjust or inequitable outcome would result from adhering to the separate existence of Portfolio.

21    The court notes that Cal Capital has estimated its damages to be approximately $250,000 (*see*

22    Doc. No. 141 at 26), far less than the $473,643 deposited with the court by Cetera that is available

23    to satisfy a judgment against Protective in Cal Capital's favor.

24    While Portfolio need only show that no genuine dispute of material fact exists as to one of

25    the two prongs of the alter ego test, it has shown that no genuine dispute of material fact exists as

26    to either.  Accordingly, Portfolio's motion for summary judgment in its favor on Cal Capital's

27    breach of contract claim brought against it will be granted.  *See Wady v. Provident Life and*

28    *Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1070 (C.D. Cal. 2002) ("Wady has not asserted

that inequitable results will follow if the corporate wall between Provident and UnumProvident is maintained, much less submitted evidence to that effect.  She has not identified any right that will be defeated if UnumProvident is allowed to maintain a separate identity from its subsidiary nor any prejudice she will suffer as a result.  Provident is fully able to respond to any damages award Wady may recover in this action.  The Court thus concludes that no genuine issue of material fact exists to support Wady's alter ego argument, and that UnumProvident is entitled to judgment as a matter of law."); *Azami*, 2021 WL 4100103, at *5 ("Azami's alter ego liability claim also fails under the second prong because Azami has not shown 'inequitable results will follow if the corporate separateness is respected.'  ONLAC could satisfy any judgment against it.  It is also unclear which 'right [ ] will be defeated' or how Azami 'will suffer as a result' of finding that ONFS and ONLAC are not alter egos.") (alterations in original) (internal citations omitted).

Finally, the court notes that despite appearing to concede in its statement of undisputed facts that its breach of contract claim relies exclusively on alter ego liability (*see* PUF ¶ 62), Cal Capital now briefly argues that "Portfolio owes a Duty to Cal Capital (directly, as an alter ego, or through concepts of agency)" in regard to that claim (Doc. No. 139 at 27).  Cal Capital provides no argument and only conclusory declarations in support of its contention that Portfolio owed contractual duties to Cal Capital either directly or because Protective was an agent of Portfolio. (*See, e.g.*, Doc. No. 140-1 at 4, 5, 17.)  Cal Capital has thereby provided no basis for the court to deny Portfolio's motion for summary judgment in its favor as to Cal Capital's breach of contract claim.  *See Publ'g Clearing House, Inc.*, 104 F.3d at 1171 ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine dispute of material fact.").

2.      Cal Capital's Claim for Breach of Fiduciary Duty

Cal Capital's claim for breach of fiduciary duty is also predicated on alter ego liability. (*See* Doc. No. 139 at 25; *cf.* PUF ¶ 148.)  Again, despite appearing to concede that its breach of fiduciary duty claim is premised on alter ego liability (*see, e.g.*, Doc. No. 139 at 25 ("A fiduciary relationship exists between Portfolio and Cal Capital because Portfolio and Protective are alter egos of other . . . ."); PUF ¶ 62), Cal Capital now briefly argues in its opposition to Portfolio's

29

1    motion that "Portfolio owes a Duty to Cal Capital (directly, as an alter ego, or through concepts of

2    agency)" in regard to that claim (*see* Doc. No. 139 at 25).  As noted above, Cal Capital's

3    argument and evidence in support of this belated contention are entirely conclusory and provide

4    no basis supporting the denial Portfolio's motion for summary judgment in its favor on this claim

5    either.  Accordingly, for the reasons discussed above, Portfolio's motion for summary judgment

6    in its favor as to Cal Capital's breach of fiduciary duty claim brought against it will be granted as

7    well.

8            3.      Cal Capital's Claim for Breach of the Covenant of Good Faith and Fair Dealing

9            Cal Capital's claim for breach of the implied covenant of good faith and fair dealing

10   asserted against Portfolio is predicated in part on alter ego liability.  (*See* Doc. No. 139 at 28, 29.)

11   For the reasons discussed above, summary judgment will be granted on this claim to the extent it

12   is predicated on alter ego liability.

13           Despite arguing in its opposition brief that "Portfolio owes a Duty to Cal Capital (directly,

14   as an alter ego, or through concepts of agency)" (Doc. No. 139 at 29), and despite addressing in

15   detail only alter ego liability in its opposition to Portfolio's motion (*see id.* at 28–30), Cal Capital

16   later asserts in its statement of undisputed facts that its claim for breach of the implied covenant

17   of good faith and fair dealing "[is] not premised on the supposition that Portfolio and Protective

18   are alter egos" (PUF ¶ 62).  Instead, Cal Capital advances three bases for this claim:  The claim

19   "arises [1] out of written contract between Portfolio and Cal Capital, [2] out of Portfolio's

20   contractual duty to indemnify Protective . . . and [3] out of Portfolio's acts and assurances that

21   they are intimately involved in the administration of their Elite Program."  (*Id.*)

22           The court concludes that there is no genuine dispute as to whether Portfolio breached any

23   implied covenant of good faith and fair dealing with Cal Capital.  As noted above, the elements of

24   breach of the implied covenant of good faith and fair dealing under California law are:  "(1) the

25   parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any

26   conditions precedent to the defendant's performance occurred; (4) the defendant unfairly

27   interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff

28   was harmed by the defendant's conduct."  *Woods*, 2024 WL 1624171, at *7.  Here, as to the first

element, there is no genuine dispute that Cal Capital and Portfolio did not enter into any contract with one another.  Contrary to Cal Capital's first proposed basis, there is no evidence of any written agreement between those two parties.  Furthermore, the relevance of Cal Capital's second basis is unclear, since Cal Capital was not a party to the indemnity agreement between Portfolio and Protective.[28]  As to Cal Capital's third asserted basis for this claim, the conclusory declarations provided by Cal Capital purporting to describe assurances made by Portfolio do not create a genuine dispute as to whether those two parties entered into a contract.  *See Publ'g Clearing House, Inc.*, 104 F.3d at 1171.

Accordingly, Portfolio's motion for summary judgment in its favor on Cal Capital's claim for breach of the covenant of good faith and fair dealing will also be granted.

4.     Cal Capital's Claim for Violation of the UCL

Cal Capital acknowledges that its UCL claim depends on the success of its other claims brought against Portfolio.  (Doc. No. 139 at 31.)  Because the court will grant Portfolio's motion for summary judgment in its favor as to all other claims brought against it, the court will also grant Portfolio's motion as to Cal Capital's UCL claim.

**CONCLUSION**

For the reasons discussed above:

1.     The cross-motion for summary judgment in its favor filed by cross-defendant Portfolio General Management Group, Inc., (Doc. No. 136) is granted;

2.     The cross-motion for summary judgment in its favor filed by cross-claimant Protective Property and Casualty Insurance Company ("Protective") (Doc. No. 138) is granted in part and denied in part as follows:

---

[28]  Cal Capital asserts as an undisputed fact that it was a "third-party beneficiary to the 2018 Program Agreement" containing the indemnity provision.  (PUF ¶ 78.)  This purported undisputed fact is in fact a legal conclusion.  The only evidence provided in support of Cal Capital's argument in this regard is the conclusory Glazer declaration, in which Glazer states without explanation "Cal Capital was a third-party beneficiary to the November 1, 2018 Program Agreement."  (Doc. No. 139-3 at 3.)  Nothing in the text of the Program Agreement suggests that Cal Capital was a third-party beneficiary, and Cal Capital has provided no basis for the court to find a genuine dispute of material fact in this regard.

     a.     Protective's motion for summary judgment in its favor as to its breach of contract claim asserted against cross-claimant Cal Capital Limited is denied;

     b.     Protective's motion for summary judgment in its favor as to Cal Capital Limited's breach of contract claim asserted against it is denied;

     c.     Protective's motion for summary judgment in its favor as to Cal Capital Limited's breach of fiduciary duty claim asserted against it is denied;

     d.     Protective's motion for summary judgment in its favor as to Cal Capital's claim for breach of the implied covenant of good faith and fair dealing asserted against it is granted;

     e.     Protective's motion for summary judgment in its favor as to Cal Capital's claim asserted against it for violation of California Business and Professions Code §§ 17200, *et seq.*, is granted;

     f.     Protective's motion for summary judgment in its favor as to Cal Capital's claim for declaratory asserted against it is denied;

3.     The Clerk of the Court is directed to update the docket to correct the name of the cross-defendant listed as "Portfolio" to:  Portfolio General Management Group, Inc.; and

4.     The Clerk of the Court is directed to terminate Portfolio General Management Group, Inc. as a named cross-defendant in this action.

5.     The parties are directed to meet and confer on their availability for trial, and within fourteen (14) days of the entry of this order, to contact Courtroom Deputy Pete Buzo at (916) 930-4016 or pbuzo@caed.uscourts.gov with several proposed dates for the rescheduling of a Final Pretrial Conference and Jury Trial in this action.

IT IS SO ORDERED.

Dated:  **September 29, 2024**                         
DALE A. DROZD
UNITED STATES DISTRICT JUDGE